## MEO *v.* MILLER

No. 39918     February 27, 1956     85 So. 2d 568

12

*John T. Barrett, Sam E. Lumpkin,* Tupelo, for appellant.

*Mitchell & McNutt,* Tupelo, for appellee.

ETHRIDGE, J.

This is a suit for damages arising out of an automobile accident. Appellant John Meo brought this action in the Circuit Court of Lee County against appellee, Eugene Miller, and the jury returned a verdict for the defendant-appellee. We have concluded that the case must be reversed and remanded for a new trial, because the verdict is against the great weight of the evidence.

The events in question occurred on February 5, 1954. Meo with his wife and child in his Pontiac automobile was driving north in Lee County on U. S. Highway No.

45. He had left his home in Pensacola, Florida, early that morning, and apparently was driving to Chicago. Highway 45 is a 20-foot paved highway running north and south. The Saltillo Road is a black-topped road which crosses Highway 45 diagonally from northeast to southwest. The accident occurred at this intersection. On Highway 45 about 800 to 1000 feet south of the intersection is a bridge. Meo was driving north in his Pontiac and was either on or immediately north of the bridge when he saw Miller's Chevrolet pickup truck stop on the east side of the highway facing west.

Meo was driving around 45 to 50 miles an hour as he approached the intersection. The great weight of the evidence reflects that, when he got within 60 to 100 feet of it, Miller in his pickup truck abruptly pulled out in front of him to cross the highway and go southwest on the Saltillo Road. Just before Miller pulled out Meo blew his horn. When the pickup truck pulled in front of Meo at this short distance away, Meo immediately put on his brakes and turned to the right to avoid Miller's truck. The Pontiac turned on to the gravel and dirt shoulder of the road. Miller's truck occupied at least part of the east side of the highway as Meo's car swerved to the rear of the pickup. There was no collision, but Meo's Pontiac car ran off the shoulder and turned over in the ditch about 35 to 40 feet north of the Saltillo Road and east of Highway 45. As a result, plaintiff was injured.

The pertinent statute is Mississippi Code of 1942, Section 8197: "Vehicle entering through highway or stop intersection.—(a) The driver of a vehicle shall stop as required by this Act at the entrance to a through highway and shall yield the right of way to other vehicles which have entered the intersection from said through highway or which are approaching so closely on said through highway as to constitute an immediate hazard, but said driver having so yielded may proceed and the drivers of all other vehicles approaching the intersection

on said through highway shall yield the right of way to the vehicle so proceeding into or across the through highway.

"(b) The driver of a vehicle shall likewise stop in obedience to a stop sign as required herein at an intersection where a stop sign is erected at one or more entrances thereto although not a part of a through highway and shall proceed cautiously, yielding to vehicles no (not) so obliged to stop which are within the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

■■■ Although the defendant's testimony warranted submitting the case to the jury, we think that the verdict was against the overwhelming weight of the evidence. Briefly stated, that evidence shows that Miller abruptly pulled out in front of Meo's car at a time when Meo was "approaching so closely on said through highway as to constitute an immediate hazard", as provided in Section 8197.

With reference to the time when Miller pulled out on the highway, plaintiff said that he was 30 to 40 feet from the intersection when Miller came out. His wife said that Miller drove out when they were 50 feet from the intersection. Three disinterested and unimpeached local witnesses for the plaintiff substantially corroborated their testimony. Frank Morrow, Bill Raines and Claude Raines all of Saltillo were standing at the south end of the gasoline pumps at Pyle's filling station and store located on the southeast corner of this intersection. They saw what happened. Morrow said that when Meo was about 100 feet from the pickup he sounded his horn, and defendant started to move out on the highway when Meo's car was about 100 feet away. Bill Raines said that the Pontiac was 60 to 80 feet down the highway from the intersection when the pickup started pulling out on the highway. Claude Raines testified that immediately after Meo blew his horn Miller pulled into the intersection and on the highway, when Meo's car was 70 to

80 feet away, Guy Hovis, a state highway patrolman, testified that he arrived at the scene shortly after the accident, and there was nothing there to indicate an excessive speed on the part of Meo; that he talked to Miller, who told him that "he started out on the highway and he saw this car coming and he thought he would have time to beat it across the road."

As to the speed of Meo's car, plaintiff testified that he was driving 45 miles an hour, his wife said 50 to 60 miles per hour, Morrow said 45 to 50, Bill Raines said 40 to 50, and Claude Raines said 45 to 50 miles per hour. Hovis, the highway patrolman, said that he examined the skidmarks of the Pontiac, and that there was nothing to indicate excessive speed on the part of Meo.

With reference to the location of Miller's pickup truck on the highway at the time the Pontiac avoided the collision by driving to the east and rear of the pickup, plaintiff testified that Miller pulled out and stopped in the middle of the highway, covering part of both sides of the road. Mrs. Meo corroborated her husband's testimony to this effect. Frank Morrow testified that part of the pickup was in the west lane and part was in the east lane of the highway when Meo went through the intersection; that the front wheels of the pickup were at the edge of the pavement on the west side, and the back of the pickup was across the centerline, manifestly on the east side. Bill Raines said that the pickup was on the highway when Meo came through the intersection, and since the highway was 20 feet in width, this necessarily means that the rear of the pickup was on part of the east or Meo's side. Claude Raines said that Miller pulled on to the highway when Meo was 70 to 80 feet from him, and that the Miller car turned to the right on two wheels, necessarily to avoid the Miller pickup, which obviously means that Miller's truck was blocking part of the east lane when Meo's car came through the intersection.

A brief summary, therefore, of appellant's evidence, not only by himself and his wife, but also by three disinterested local witnesses, who are the only ones to actually see all of the events, is that Miller pulled out on the highway directly in front of Meo's car, which was traveling 40 to 50 miles an hour (his wife said 50 to 60), at a time when the Meo car was only 60 to 100 feet from the intersection; that when the Meo car passed through the intersection the truck was occupying a part of the east or Meo's right side of the highway, and Meo had to turn to the right quickly to avoid a collision. In other words, according to appellant's evidence, Miller pulled out on the highway when Meo's car was entirely too close to the intersection and when it constituted an immediate hazard within the meaning of Code Section 8197.

Appellee relies principally upon his testimony and that of Mrs. Lynette Sullivan. Miller said that he had been to Saltillo to buy some fertilizer; that he drove up to the highway, stopped, looked up and down the road, and saw a car below the bridge, 800 to 1000 feet south; that he saw some ladies get out of a car parked near the filling station on the southeast corner; and that he went out in the road and "when I looked I saw the car was closer and I went in low and done all I could." He said that he pulled out on the road after he looked both north and south; and that he was in the road when he saw plaintiff's car "really flying looked to me like, ... looked like 75 or 80 miles to me. I just floor-boarded it in low to get out of the way." After he crossed, he looked back and saw the Meo car off the road. He admitted that he could not estimate the plaintiff's speed, but he could tell he was coming fast. He denied that he waved to the ladies getting out of their car, but indicated he spoke to them. He said that he heard the horn blow, and that he was "about the center of the highway" when the horn started, that "he was pretty darn close." In other words, Miller himself admitted that plaintiff's car was close on him when he reached the center part of the highway,

and that when the horn started he was in the center. He did not know when plaintiff blew his horn, but the only three witnesses who observed that and the location of the cars at the time placed Meo only 60 to 100 feet from the intersection when he blew his horn, at which point Miller pulled out on the highway. Appellee's evidence does not contradict that position of Meo's car at that time. So defendant's own testimony places him in the middle of the highway when plaintiff's car was only 60 to 100 feet from him.

Mrs. Sullivan testified that she had stopped at the service station on the southeast corner, and she saw Miller drive up to the intersection and stop, and wave at them; that she did not know whether Miller looked to the south or to the north and did not know the speed of Meo's car. Mrs. Sullivan said that Miller stopped at the intersection "a good bit", and that then he started out on the highway. She stated that when the Meo car came by the truck was half way across the road, past the center line, when Meo's car missed it. She did not see the Meo car coming "until he was missing the back of Miller's truck." Mrs. Sullivan therefore had no knowledge of the speed of Meo's car, and did not know how far from the intersection Meo's car was when the truck pulled out on the highway. So she does not contradict appellant's witnesses in those respects. She does say that the truck was past the center line when the Meo car came by, but that is not consistent with appellee's own testimony, and is contradicted by the great weight of the evidence, including the physical facts and the testimony not only of plaintiff and his wife, but of three disinterested local witnesses who testified for plaintiff.

Defendant also offered as a witness Tom McCarty. He did not see the accident, but was a quarter of a mile west of it driving east on the Saltillo Road. He said a horn blew "like it was stuck", and that after he arrived he saw skidmarks of the Pontiac for 50 to 75 feet; that from what he saw the car went clear of the em-

bankment for 20 to 25 feet, and then struck the ground. However, his testimony is not directed to the crucial issue in this case, namely, whether Miller pulled out on the highway at a time when Meo's car was so close to the intersection as to constitute an immediate hazard. The great weight of the evidence indicates that Miller did this at a time when Meo's car, driving at a legal rate of speed, was only 60 to 100 feet from the intersection, and that when appellant's car crossed the intersection appellee's truck was occupying part of the east lane. Although appellee's evidence was sufficient to prevent the granting of a peremptory instruction to the plaintiff on liability, for the above stated reasons we think that the overwhelming weight of the evidence is contrary to the verdict rendered, so the case must be reversed and remanded for a new trial.

Jones v. Carter, 192 Miss. 603, 7 So. 2d 519 (1942), is not controlling here, because the Court found in that case that "the defendant's car had necessarily entered on the intersection to cross the same when the other car first came in sight 468 feet away." In the instant case, the great weight of the evidence reflects that the defendant's car entered the intersection when the plaintiff's car was only 60 to 100 feet away, thereby constituting an immediate hazard under Section 8197. Compare in this respect Davidian v. Wendell, 37 So. 2d 570, 771 (Miss. 1948); Avent v. Tucker, 188 Miss. 207, 194 So. 596 (1940); see also Baird v. Harrington, 202 Miss. 112, 30 So. 2d 82 (1947); Jefferson v. Pinson, 69 So. 2d 234 (Miss. 1954).

We have considered carefully the other assignments of error, and find that there is no merit in them.

Reversed and remanded.

*McGehee, C.J.,* and *Roberds, Hall* and *Arrington, JJ.,* concur.

LEE, J. dissenting.

It is elemental that this Court will not reverse a judgment, founded on the verdict of a jury, if there is substantial evidence to sustain such verdict.

Believing implicitly that the jury had substantial evidence on which to decide the issue as it did, I can not agree that the verdict is contrary to the great weight of the evidence.

All of the witnesses agreed that it was at least 800 feet from the intersection south to a bridge on Highway 45.

The defendant Miller, traveling in his pickup truck on the Saltillo Road, came to the intersection with U. S. Highway 45. He stopped seven or eight feet from the edge of the pavement. According to his testimony, he looked south and saw below the bridge a car traveling north. He had crossed this intersection many times and had never had any trouble getting over the intersection when a car was that far away. He looked north and no vehicle was approaching from that direction. He then put his vehicle in low gear and started across. He was "about the center of the highway" when a horn blew. Looking in that direction, he saw the car coming toward him at a terrific rate of speed. He was scared and "floor-boarded it in low to get out of the way", that is, he ran as fast as he could go in low gear. He had gone, as he surmised, 150 feet across the intersection when he looked around and saw the car turning over, about 80 or 100 feet north of the intersection. According to Frank Morrow, a witness for the plaintiff, the Pontiac, operated by Meo, when he sounded its horn, was about 100 feet from the pickup. This witness also said that, when the Pontiac went through the intersection, "the front wheels of the pickup truck were at the edge of the pavement on the west side * * * that would put the back of the pickup across the center line". Mrs. Lynette Sullivan, in an automobile near the intersection, saw Miller stop long enough to see that nothing was coming either way. She did not see the Pontiac until it was missing the pickup.

The pickup at that time was "half way across the road, the back of his truck. Q. Was past the center line? A. Yes."

The plaintiff admitted that the speed of his car at the time was "at least forty-five miles an hour". His wife said that it was "between fifty and sixty miles an hour. Frank Morrow said "forty-five to fifty miles an hour". Bill Raines, another witness for the plaintiff, said "between forty and fifty". Claude Raines, another witness for plaintiff said "between forty-five and fifty miles". Frank Morrow said that the skidding of the Pontiac started "almost at the time the horn blew", which, according to his testimony, was 100 feet from the pickup. Tom McCarthy, who came up to the scene several minutes later, corroborated Morrow about the skidding and testified that the car continued to skid after it left the pavement for "fifty or sixty or maybe seventy-five" feet. The defendant Miller testified that the Pontiac "was really flying * * * looked like seventy-five or eight miles".

Taking into consideration all of the evidence as to speed, including the estimates of the witnesses and the physical facts as to skidding, together with the reasonable inferences therefrom, the jury, in my opinion, were well warranted in finding that the Pontiac was traveling at a speed equal to, or in excess of, sixty miles an hour. Traveling at that rate of speed, it would have taken only nine to ten seconds for the car to negotiate the distance between the bridge and the intersection.

I therefore think that the jury had sufficient evidence to find that the speed of the Pontiac was so great that Miller, after stopping and looking, as the law required him to do, was almost run over by it before he could get across the intersection and out of the way. We have come to a pretty pass in this country if a motorist must not try to cross over a highway intersection, if another motorist, on one of these highways, is as close as 800 feet to the intersection.

Now Meo testified that, as he came over the bridge, he noticed the pickup at the intersection, and that when he was within thirty or forty feet, the pickup pulled out in front of him and stopped "in the middle of the highway". Mrs. Meo testified that their car was "about fifty feet" from the intersection when the pickup pulled out. Frank Morrow said that the pickup was pulling across the intersection when he heard the horn blow, which occurred when the Pontiac was about 100 feet from the intersection, according to his evidence. Bill Raines testified that the Pontiac was "sixty, seventy, maybe eighty feet" from the intersection when the pickup started across. Claude Raines testified that it was "seventy or eighty" feet.

If the speed of the Pontiac was as much as sixty miles an hour, it would travel eighty-eight feet in one second. If as low as forty miles an hour, it would travel almost sixty feet in one second. To me, it is incredible that Miller could have started his pickup in low gear from a point seven or eight feet east of the pavment and could have gotten to the middle of the pavement in one second. The Pontiac, traveling so much faster, either would have beaten it through the intersection, or a collision would have been inescapable. I think this evidence was so improbable and unreasonable that the jury was warranted in rejecting it.

Meo admitted that the pickup had stopped at the intersection and that he saw it on the east side of the highway, headed west, when he came over the ridge. At that time, he was at least 800 feet from the pickup. What should a motor vehicle, standing a few feet from the edge of the pavement at an intersection, signify to any reasonable or prudent man? Obviously, that the motorist was expecting to cross over the intersection. Thus when Meo was 800 feet from the intersection, he knew, or in the exercise of reasonable care, ought to have known, that the car at the intersection was about to

cross. Ordinary care, under the circumstances, required him to reduce his speed and get his vehicle under control. Section 8176 (a) 3, Code of 1942 Anno., fixes the maximum speed of private passenger vehicles at sixty miles an hour; and (b) thereof provides that "the driver or operator of any motor vehicle must decrease speed when approaching and crossing an intersection * * *". I think the jury were fully warranted in finding that the plaintiff wholly failed to exercise reasonable care, and completely ignored the injunction of the law, namely, to slow down as he was approaching the crossing; and that his dangerous rate of speed, under the circumstances, was the sole proximate cause of his injury.

With the greatest deference to the majority I think that Jones v. Carter, 192 Miss. 603, 7 So. 2d 519, is directly in point for a decision of this case. The collision in that case occurred on Highway 80, running east and west, with a standard twenty-foot pavement. The driver of a west bound automobile could not see the intersection until he got within 468 feet. Neither could a person, on or about the intersection, see an automobile approaching from the east until it was within 468 feet thereof. Jones started his car from a point 44 feet south of the pavement and drove northeastwardly across the diagonal intersection. His front wheels had gotten onto the gravel on the north side of the pavement and his back wheels were about half way between the center stripe and the north edge of the pavement, when his car was struck by the Carter car, which did not undertake to reduce its speed until it was within forty-three feet of the Jones car. The jury found a verdict for Mrs. Carter. On appeal here, this Court in an opinion written by Justice McGehee said that "the case presented is extremely close on the question as to whether the defendant was entitled to a peremptory instruction in his behalf. At any rate, we are of the opinion that the case should be reversed and remanded on account of

the verdict being contrary to the overwhelming weight of the evidence.'' The case was reversed and remanded.

On the second trial, the jury again returned a verdict for the plaintiff. On appeal here, Jones v. Carter, 195 Miss. 182, 13 So. 2d 623, this Court again reversed and remanded the case. Judge Griffith, who wrote the opinion, said: ''We are no more impressed with the merits as regards the plaintiff's action than we were on the consideration of the first record, which we have carefully compared with what is shown on the present record. We are impressed now as we were then, that what we have here is simply another case of that which is seen every day by any who travel in automobiles on the streets or highways of this state, or who as pedestrians observe that travel, namely, that many, if not most of those who are proceeding upon through highways, do so upon the arrogated assumption that they have the right to drive thereon at any undiminished speed which they may elect for themselves and that those who have first arrived, and are about to cross, at an intersection must yield so long as the driver on the through highway has appeared within sight, and regardless of the speed at which he is driving. This is not the law as, in substance, we pointed out in the former opinion. * * * We therefore again reverse on the ground that the verdict is against the manifest weight of the evidence * * *.''

In that case, Carter had only 468 feet within which to see the Jones car and decrease his speed in order to prevent a collision; and a verdict in Mrs. Carter's behalf was twice held to be against the manifest weight of the evidence.

In the case here, Meo had 800 feet within which to decrease his speed and avoid a collision. Instead of doing so, he operated his Pontiac at a rate of speed, which the jury was warranted in finding to be equal to or in excess of sixty miles an hour. He did not collide

with the Miller pickup, but ran off of the road instead. Although the jury returned a verdict against Meo and in favor of Miller the majority opinion holds that the verdict, so returned, is against the great weight of the evidence. I cannot reconcile this action with the two holdings in Jones v. Carter, supra.

*Holmes* and *Gillespie, JJ.,* join in this dissent.